## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ERNEST C. TOSH,** | : | |
| | : | |
| **LAW OFFICES OF ERNEST C. TOSH** | : | |
| **2709 Thorne Lane** | : | |
| **Grapevine, TX 76051** | : | |
| | : | |
| **and** | : | |
| | : | |
| **DAVID T. MARKS** | : | |
| | : | |
| **MARKS, BALETTE, GIESSEL** | : | |
| **& YOUNG, P.L.L.C.** | : | |
| **7521 Westview Drive** | : | |
| **Houston, TX 77055** | : | |
| | : | |
|     **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Case No.:** |
| | : | |
| **UNITED STATES CENTERS FOR** | : | |
| **MEDICARE & MEDICAID SERVICES,** | : | |
| | : | |
| **7500 Security Blvd.** | : | |
| **Baltimore, MD 21244** | : | |
| | : | |
| **and** | : | |
| | : | |
| **UNITED STATES DEPARTMENT** | : | |
| **OF HEALTH AND HUMAN SERVICES,** | : | |
| | : | |
| **200 Independence Ave., SW** | : | |
| **Washington, DC 20201** | : | |
| | : | |
|     **Defendants.** | : | |
| _____ | : | |

## COMPLAINT

Plaintiffs Ernest C. Tosh ("Tosh") and David T. Marks ("Marks") (collectively,

"Plaintiffs") bring this action under the Freedom of Information Act, 5 U.S.C. §552, to compel

disclosure of records wrongfully withheld from public disclosure by the United States Centers

for Medicare & Medicaid Services ("CMS") and the United States Department of Health and

Human Services ("HHS") (collectively, "Defendants").

## Preliminary Statement

1.      Nursing home facilities play a vital role in American healthcare and increasingly

are responsible for providing daily care for the country's aging population.  Due to dementia,

Alzheimer's and other mentally and physically debilitating conditions, a significant portion of

the nursing home population is unable not only to care for themselves but also to manage, and

scrutinize, the care they receive.  Reports abound of fragile nursing home residents who do not

receive the care they need and are supposed to get, and are left in deplorable conditions: those

who are not turned in their beds and consequently develop bedsores; those who are left in urine-

soaked or otherwise soiled garments; those whose bodies atrophy from lack of movement.  Such

conditions not only degrade nursing home residents, but threaten their health and ultimately even

their lives.

2.      Elder care advocates seek to uncover, and remedy, these conditions in a variety of

ways.  One objective means of doing so is through analysis of the Minimum Data Set

assessments ("MDS assessments") that must be filed with CMS by all certified Medicare and

Medicaid nursing homes nationwide.  These assessments, which must be submitted on a frequent

periodic basis for each and every resident in a facility, contain date-specific assessments of the

condition of, the care required by, and the care provided to each resident.  CMS established a

precedent for the use of MDS assessments in determining the workload of nursing homes and the

impact of this workload on the capacity of staff to deliver basic care to nursing home residents.[1]

CMS reported to Congress that the amount of staffing required to meet the care needs of

---

[1] *See* Phase II Report to Congress, *Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes* (2001); https://phinational.org/resource/report-to-congress-appropriateness-of-minimum-nurse-staffing-ratios-in-nursing-homes-phase-ii-volume-i/.

residents is a function of the aggregate quantity of the basic care services identified in the MDS assessments of a nursing home's patient population.  Accordingly, analysis of the data contained in such MDS assessments provides a basis for determining whether a nursing home had sufficient number of staff to provide the basic care services needed by the residents whose well-being was entrusted to the facility.

3.      Plaintiffs are attorneys who represent nursing home residents across the country who have been injured or endangered as a result of nursing homes' understaffing or other neglect. Plaintiffs also represent or work with States and local district attorneys in the civil prosecution of understaffing cases.  Plaintiffs requested FOIA disclosure by CMS of de-identified copies of the nationwide MDS assessments at issue here to facilitate their analysis of (1) whether particular nursing homes have been appropriately staffed to provide adequate care to their resident populations, (2) the magnitude of a particular nursing home's understaffing based on its unique workload and staffing in comparison to state and national data, (3) whether CMS is adequately enforcing its existing regulations and requirements with respect to such institutions, and (4) whether additional resources need to be provided to CMS to ensure that such conditions are not allowed to continue to endanger nursing home populations.  Faced with CMS' inordinate delays in processing Plaintiffs' FOIA requests and their subsequent administrative appeal, and the agency's groundless invocation of FOIA Exemption 6 notwithstanding that Plaintiffs seek only de-identified data, they have brought this action to compel disclosure.

**Background**

4.      Americans are spending more and more money each year on nursing home care and continuing care retirement homes.  Since 1960, the total amount spent has grown steadily

4846-2696-2015v.3 0110383-000001

from $811 *million* to a staggering $162 *billion* in 2016.[2]  The federal government estimates that

public and private spending on long-term nursing care could exceed $350 billion by 2050.[3]

5.     This increase in cost is directly driven by the country's aging population.  In

2005, there were 36,790,113 Americans aged 65 and older.[4]  By 2014, that number had grown to

46,243,211, and the number of Americans aged 85 and over increased by 21 percent from

5,095,938 in 2005 to 6,162,231.[5]

6.     In 2015, there were more than 15,000 nursing homes in the United States, nearly

11,000 of which are operated on a for-profit basis.[6]  By the end of 2014, more than 1.4 million

Americans resided in nursing homes.[7]

7.     Persons admitted to a nursing facility have limitations caused by physical

deterioration, cognitive decline, the onset or exacerbation of an acute or chronic illness or

condition, and other related factors.  They need nursing care, medical treatment, and

rehabilitation to maintain functional status, increase functional status, or live safely from day to

day.  Many such residents are elderly, disabled, confined to their wheelchairs or beds, or unable

to rise from a bed or chair independently, and unable to groom, feed, toilet or clean themselves.

---

[2] *See* CENTER FOR MEDICARE & MEDICAID SERVICES, "National Health Expenditures by type of service and source of funds, CY 1960-2016", *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/NationalHealthExpendData/NationalHealthAccountsHistorical.html.

[3] *See* Statement of David M. Walker, Comptroller General of the United States, Testimony Before the Special Committee on Aging, U.S. Senate, "Aging Baby Boom Generation Will Increase Demand and Burden on Federal and State Budgets" (March 21, 2002), *available at* https://www.gao.gov/new.items/d02544t.pdf.

[4] *See* CENTER FOR MEDICARE & MEDICAID SERVICES, "Nursing Home Data Compendium 2015 Edition", at 39, *available at* https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/Downloads/nursinghomedatacompendium_508-2015.pdf (the "Data Compendium").

[5] *Id.*

[6] *Id.* at 1, 31.

[7] *Id.* at 2, 199.

4846-2696-2015v.3 0110383-000001

8.      Virtually all residents require staff assistance with at least one Activity of Daily Living ("ADL").  Activities of daily living are those that able-bodied persons often take for granted, and include activities such as (1) turning over in bed, (2) getting out of bed, (3) getting dressed, (4) eating, and (5) using the bathroom.[8]

9.      A resident has a "severe ADL impairment" if she needs to rely on staff assistance for at least four of the five ADLs.  The level of assistance can vary from needing supervision and encouragement—which often takes as much time as physical assistance—to total physical dependence, sometimes requiring multiple staff members.

10.     The number of residents with severe ADL impairments has been increasing year over year; by 2014, over 63 percent of nursing home residents had a severe ADL impairment.[9] Put simply, nursing home residents require more care than ever before.

11.     Consequently, many nursing home residents rely upon nursing home staff for not only skilled nursing care and treatment, but also assistance with ADL activities (herein "Basic Care"), including:

    a.   toileting assistance;

    b.   incontinence care and changing of wet and soiled clothing and linen;

    c.   assistance transferring to and from bed and wheelchair;

    d.   assistance with dressing and personal hygiene;

    e.   assistance with bathing;

    f.   assistance with turning and repositioning residents in a bed or chair;

    g.   feeding assistance; and

    h.   exercises/passive range of motion ("ROM") exercises.

---

[8] *Id.* at 5, 207.

[9] *Id.* at 156, 207.

12.     The specific level of Basic Care assistance that is needed, and that is provided, to each resident is captured at the time of admission, at periodic intervals prescribed by CMS, and upon any significant change in conditions, in an assessment tool known as Minimum Data Set Resident Assessment and Care Screenings, the current version of which is referred to as Minimum Data Set 3.0 ("MDS 3.0").  Such reports are prepared pursuant to congressional and agency mandate.  *See* 42 U.S.C. § 13956i-3 ("Requirements for, and assuring quality of care in, skilled nursing facilities") and 42 U.S.C. § 1396r ("Requirements for nursing facilities") (establishing requirements relating to the provision of services, including quality of life, quality assessment and assurance, residents' assessment, and the use of such data in developing, reviewing and revising residents' plans of care); and 42 C.F.R. § 483.35 ("Nursing services") (requiring facilities to "have sufficient nursing staff with the appropriate competencies and skills sets to provide nursing and related services to assure resident safety and attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, as determined by resident assessments and individual plans of care and considering the number, acuity and diagnoses of the facility's resident population in accordance with the facility assessment required at § 483.70(e).").

13.     Defendant CMS describes Minimum Data Set 3.0 Public Reports as follows:

The Minimum Data Set (MDS) is part of the federally mandated process for clinical assessment of all residents in Medicare and Medicaid certified nursing homes.  This process provides a comprehensive assessment of each resident's functional capabilities and helps nursing home staff identify health problems. Care Area Assessments (CAAs) are part of this process, and provide the foundation upon which a resident's individual care plan is formulated.  MDS assessments are completed for all residents in certified nursing homes, regardless of source of payment for the individual resident.  MDS assessments are required for residents on admission to the nursing facility, periodically, and on discharge. All assessments are completed within specific guidelines and timeframes.  In most cases, participants in the assessment process are licensed health care professionals

employed by the nursing home.  MDS information is transmitted electronically by nursing homes to the national MDS database at CMS.[10]

14.     Nursing homes must complete and certify the accuracy of every MDS assessment, listing the Basic Care required by and provided to each nursing home resident on a daily basis. The importance of this MDS data is evident from the fact that not only must nursing homes certify that it is accurate and truthful, they must also acknowledge that the assessment information is used as a basis for payment from government-funded healthcare programs and that the submission of false information can lead to substantial criminal, civil and/or administrative penalties.

15.     MDS assessments are routinely transmitted electronically by each individual nursing facility to a national MDS database managed by CMS.

16.     Using the MDS resident assessments and widely-accepted industrial engineering simulations, the minimum time required for a Certified Nursing Assistant ("CNA") to care for individual residents can be determined.  This data can then be compared with nursing facilities' self-reported staffing data to calculate the total CNA hours available in any given nursing facility to provide care.  This comparison can reveal any deficiencies in Basic Care provided to patients at nursing facilities.

17.     The data indicates that many nursing facilities have chronic problems with understaffing.  Understaffing has a very human cost, not only to the dignity of nursing home residents but to their basic safety and well-being.  For example, it can lead to:

---

[10] CENTERS FOR MEDICARE & MEDICAID SERVICES, *Minimum Data Set 3.0 Public Reports*, https://www.cms.gov/Research-Statistics-Data-and-Systems/Computer-Data-and-Systems/Minimum-Data-Set-3-0-Public-Reports/index.html (Nov. 11, 2012 1:22 PM).

a.  Failing to regularly provide toileting, incontinence care and basic hygiene care, and leaving dependent residents in dirty diapers, dirty clothes and dirty beds for hours at a time;

b.  Failing to timely respond to call lights rung by residents, leaving residents to soil themselves while waiting for assistance, or falling while attempting to walk to the bathroom unaided;

c.  Failing to reposition bed-bound and immobile residents, causing these residents to remain in the same position for hours at a time, which can result in painful and infection-prone pressure sores;

d.  Failing to undertake ROM exercises, such as moving joints and limbs, and assisting vulnerable residents who can walk and exercise, causing lost mobility, leaving residents less independent;

e.  Failing to wash and bathe dependent residents;

f.  Failing to get residents up, dressed, and out of bed; and

g.  Failing to assist dependent residents with meals, causing these residents to miss designated mealtimes, leading to weight loss and dehydration.

18.  Nursing facilities are paid based on the expectation that this Basic Care is being provided to residents.  In reality, not only are many facilities paid for work that goes undone, their staffing practices cost residents their dignity and comfort and jeopardize their safety and, sometimes, their very lives.  The failure to provide Basic Care violates the law and the promises that nursing home facilities make to families.  It also degrades residents and increases their risk of serious negative health consequences.

19.     Proper care simply cannot be provided to nursing home residents unless there is an adequate number of properly trained staff, especially in homes where many of the residents have four or more ADLs.

20.     In 2014, HHS's Office of Inspector General ("OIG") published a report indicating that an estimated 22 percent of Medicare beneficiaries experienced "adverse events" during their nursing home stays, with an additional 11 percent experiencing "temporary harm events" during their stays.[11]   According to physician reviews, some 59 percent of these adverse events and temporary harm events were clearly or likely preventable.[12]   The OIG concluded that Medicare spent an estimated $2.8 billion on hospitalizations associated with adverse events in 2011.[13]

21.     The root of virtually all preventable adverse events in nursing homes is related to insufficient staffing.  In 2000-2001, CMS and principal investigator Dr. John Schnelle studied what happens to the delivery of Basic Care when the nurse aide-to-resident ratios are increased or decreased in nursing homes with various ADL workloads.  The workloads studied were determined based on resident MDS acuity data—which are the same type of acuity documents at issue in this case.  MDS assessments provide detailed information both as to what ADL care a resident needs assistance with and what levels of ADL support the nursing home claims to have provided.[14]   The General Accounting Office also has concluded that quality care is more

---

[11] DEPARTMENT OF HEALTH AND HUMAN SERVICES OFFICE OF INSPECTOR GENERAL, "Adverse Events in Skilled Nursing Facilities: National Incidence Among Medicare Beneficiaries", February 2014, *available* at https://oig.hhs.gov/oei/reports/oei-06-11-00370.pdf, at 17, 20.

[12] *Id.* at 22.

[13] *Id.* at 26.

[14] *See* "Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes," Dec. 2001, *available at* https://www.justice.gov/sites/default/files/elderjustice/legacy/2015/07/12/Appropriateness_of_Minimum_Nurse_Staffing_Ratios_in_Nursing_Homes.pdf.

dependent on staffing levels than spending levels.[15]  So too have the Coalition of Geriatric

Nursing Organizations and other expert authorities.[16]

22.     As recently as April 2, 2018, as part of the House Energy and Commerce

Committee's inquiry into CMS's oversight of the nation's nursing homes, the Committee Chair

and three other members sent a letter to CMS's Administrator noting recent media reports of

"horrific instances of abuse, neglect, and patient harm allegedly occurring at SNFs [skilled

nursing facilities] and NFs [nursing facilities] across the country ...."  *See* Exhibit A p. 1.  The

congressmen stated that

> [t]hese reports raise serious questions about the degree to which the Centers for
> Medicare and Medicaid Services (CMS) is fulfilling its responsibility to ensure
> federal quality of care standards are being met, as well as its duty to protect
> vulnerable seniors from elder abuse and harm in facilities participating in the
> Medicare and Medicaid programs.  The adequacy of the CMS' oversight of SNFs
> and NFs has also been called into question in recent reports issued by the Office
> of Inspector General at the U.S. Department of Health and Human Services (HHS
> OIG) and the U.S. Government Accountability Office.

*Id.*, p.1 (footnote omitted).  The congressmen made sweeping requests for information and

documents relating to CMS's role in overseeing all SNFs and NFs participating in the Medicare

and Medicaid programs.  *Id.,* p. 5, 6 (footnotes omitted).

23.     To test the correct levels of staffing needed to meet acuity, and ultimately ensure

that Americans in nursing facilities are receiving proper levels of care, Plaintiffs and other

advocates for the elderly and infirm require access to MDS assessments that specify the ADL

care needs of each resident in each population, and permits the de-identified tracking of such

---

[15] General Accounting Office, "Nursing Homes: Quality of Care More Related to Staffing than Spending", June 13,
2002, *available at* https://www.gao.gov/assets/100/91315.pdf.

[16] *See* THE COALITION OF GERIATRIC NURSING ORGANIZATION, "Nursing Staffing Requirements to Meet the
Demands of Today's Long Term Care Consumer Recommendations from the Coalition of Geriatric Nursing
Organizations", *available at*
https://hign.org/sites/hartford/files/policy/partnerships/cgno/CGNO%20Nurse%20Staffing%20seven%20orgs_2014.
pdf.

resident-specific data over time.  Likewise, they need access to such data to assess whether CMS

is adequately enforcing its existing regulations and requirements with respect to such institutions,

or whether additional actions need to be taken by CMS to ensure that such conditions are not

allowed to endanger nursing home populations.  It is such de-identified MDS data that is at issue

in this case.

24.     Plaintiffs are bringing this action because of Defendants' reversal of their prior

practice of providing de-identified MDS data to the public and to Plaintiffs, their erection of

administrative barriers to public access to this important information, and their denial of

Plaintiffs' requests for disclosure of records to which they are entitled under the Freedom of

Information Act.

## Parties

25.     Plaintiff Tosh is the sole proprietor of the Law Offices of Ernest C. Tosh, located

at 2709 Thorn Drive, Grapevine, TX 76051.  In the course of representing clients across the

country regarding matters of nursing home abuse and neglect, he has from time to time filed

FOIA requests with CMS.

26.     Plaintiff Marks is a partner in the law firm of Marks, Balette, Giessel & Young,

P.L.L.C., located at 7521 Westview Drive, Houston, TX 77055.  In the course of representing

clients across the country regarding claims of nursing home understaffing, he repeatedly has filed

FOIA requests with CMS for MDS data for every nursing home in the United States and

repeatedly has received responsive MDS data from CMS, until the instant dispute arose.

27.     Defendant HHS is an agency of the United States Government and is

headquartered at 200 Independence Ave., SW, Washington, DC 20201.  HHS is an agency

within the meaning of 5 U.S.C. § 552(f)(1).  Upon information and belief, HHS has possession, custody and control of the records whose disclosure Plaintiffs seek to compel.

28.      Defendant CMS is a subdivision of HHS, and is headquartered at 7500 Security Blvd., Baltimore, MD 21244.  CMS is an agency within the meaning of 5 U.S.C. § 552(f)(1). Upon information and belief, CMS has possession, custody and control of the records whose disclosure Plaintiffs seek to compel.

## Jurisdiction

29.      This Court has jurisdiction over this action pursuant to 5 U.S.C. § 552(a)(4)(B), and 28 U.S.C. § 1331.  Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202.  *See also* Fed. R. Civ. P. 65.

## Venue

30.      Venue in the United States District Court for the District of Columbia is proper under 5 U.S.C. § 552(a)(4)(B), and under 28 U.S.C. § 1391(e).

## Facts as to Plaintiff Tosh

31.      On January 24, 2017, as part of his investigation into potential claims of elder abuse, Tosh submitted a FOIA request to CMS seeking disclosure of MDS data filed by the Linda Valley Care Center, located in Loma Linda, CA, for the period of January 1, 2012 through December 31, 2016 (the "Linda Valley FOIA Request").

32.      Tosh explicitly directed CMS to exclude personally identifiable information ("PII") included in the MDS assessments (e.g., name, date of birth, social security number, and Medicare or Medicaid number) in responding to his request.  Tosh did request that CMS include the internal identification number for each resident ("Resident Internal ID").  The Resident Internal ID is a randomly assigned number that allows successive reports relating to a particular

resident to be tracked over time, but is not capable, alone or in combination with other publicly available information, of identifying the resident to which it relates.

  33. The Linda Valley FOIA Request specifically sought the following records:

  a. Subsections from "Section A" of the MDS Report:

  b. A0050: Type of Record;

  c. A0100: Facility Provider Numbers;

  d. A0200: Type of Provider;

  e. A0310: Type of Assessment;

  f. A0410: Unit Certification or Licensure Designation;

  g. A1600: Entry Date;

  h. A1700: Type of Entry;

  i. A1800: Entry Form;

  j. A1900: Admission Date;

  k. A2000: OBRA Discharge Date;

  l. A2100: OBRA Discharge Status;

  m. A2200: Previous Assessment Reference Date for Significant Correction;

  n. A2300: Assessment Reference Date;

  o. All of "Section E: Behavior";

  p. All of "Section G: Functional Status";

  q. All of "Section GG: Functional Ability and Goals";

  r. All of "Section H: Bladder and Bowels";

  s. All of "Section J: Health Conditions";

  t. All of "Section K: Swallowing/Nutritional Status";

u.  All of "Section M: Skin Conditions";

v.  All of "Section N: Medications";

w.  All of "Section O: Special Treatments, Procedures, and Programs";

x.  All of "Section P: Restraints";

y.  All of "Section V: Care Area Assessment (CAA) Summary"; and

z.  All of "Section Z: Assessment Administration".

34.     On or about May 1, 2017, CMS disclosed to Tosh all of the MDS data requested in the Linda Valley FOIA Request, including the Resident Internal IDs, without any redactions (other than, as Tosh had directed, exclusion of the PII).  Tosh was not required to pay any funds to CMS in connection with disclosure of the MDS data responsive to the Linda Valley FOIA Request.

35.     On July 7, 2017, as part of his investigation into potential claims of elder abuse, Tosh submitted another FOIA request to CMS seeking disclosure of MDS data filed by nursing homes nationwide between January 1, 2012 and December 31, 2016.  *See* Exhibit B (the "Tosh Nationwide FOIA Request").

36.     Tosh explicitly directed CMS to exclude all PII in responding to the Tosh Nationwide FOIA Request, but did request that CMS include the Resident Internal ID for each resident.

37.     In addition to the categories of MDS data included in the Linda Valley FOIA Request, the Tosh Nationwide FOIA Request also sought:

a.  Assessment ID;

b.  Target Date;

c.  All of "Section C: Cognitive Patterns";

     d.  All of "Section D: Mood";

     e.  All of "Section F: Preferences for Customary Routine and Activities";

     f.  All of "Section I: Active Diagnosis";

     g.  All of "Section L: Oral / Dental Status"; and

     h.  All of "Section Q: Participation in Assessment and Goal Setting".

38.     On July 31, 2017, Joseph Tripline ("Tripline"), Director of CMS's Division of FOIA Analysis, responded to the Tosh Nationwide FOIA Request, stating that Tosh would have to make an advance payment of $9,016.00, pursuant to 45 C.F.R. 5.51(b), before CMS would produce the requested documents.

39.     Due to the surprisingly large amount of the fee demanded, on August 11, 2017, Tosh requested that CMS provide a sample of the requested data so he could verify that the data to be produced would be responsive to his request, and that the documents would be produced in a usable format.

40.     On August 14, 2017, Vendetta Dutton—a Government Information Specialist at CMS—informed Tosh that CMS would not provide a sample of the data, and informed him that the $9,016 cost "estimate" was based on the search time and the time required to program and run a search for the requested fields.

41.     On August 28, 2017, Tosh responded to Mr. Tripline and included a check in payment of the $9,016.00 fee.  Tosh reiterated his request for a sample, noting that CMS had produced unusable responses in the past, requiring multiple requests on Tosh's part to get the correct data.  Tosh indicated that a sample would mitigate the risk of incorrect production because it would allow him to ensure that the data requested was actually being delivered.  Tosh

4846-2696-2015v.3 0110383-000001

further requested that the data be delivered electronically due to its large size.  This correspondence occurred **52 days** after the filing of Tosh's FOIA request.

42.     Tosh followed up with an email to Mr. Tripline on September 25, 2017, stating that he had not yet received the requested data, and reiterating that he desired the information to be provided to him electronically.  This correspondence occurred **80 days** after Tosh's FOIA request.

43.     Tosh contacted Mr. Tripline and Ms. Dutton again on October 4, 2017 via email, noting that CMS had deposited the check he sent for $9,016, but not yet released the requested records.  Tosh requested that the data be sent to him electronically, and again requested a sample. This correspondence occurred **89 days** after Tosh's FOIA request.

44.     Mr. Tripline responded via email that same day and confirmed that CMS would be providing Tosh with a sample of the requested MDS data.

45.     Two months later, having received nothing from CMS, Tosh sent another email to Mr. Tripline on December 6, 2017.  Tosh reiterated that he still had not received any sample data despite the fact that he paid CMS over $9,000 in August.  He further stated that he desired the data to be sent electronically or via an external hard drive.  This correspondence occurred **152 days** after Tosh's FOIA request.

46.     On December 21, 2017, Hugh Gilmore ("Gilmore"), Director of CMS' Division of Freedom of Information, Office of Strategic Operations and Regulatory Affairs, participated in a conference call with Plaintiff Marks and others.  During that call, Mr. Gilmore agreed to combine the Tosh Nationwide FOIA Request and the Marks Nationwide FOIA Request and to produce MDS data from January 1, 2012 through the most current date to Marks.  Mr. Marks

sent an email to Gilmore confirming the substance of the agreement.  (*See* discussion below at ¶ 65.)

47.     On January 30, 2018, CMS finally provided Tosh with a sample of the data that it proposed to disclose in response to the Tosh and Marks Nationwide FOIA Requests.  This was now **207 days** after the Tosh's FOIA request and **118 days** after CMS first promised to send the sample.

48.     The sample reflected that CMS intended to redact significant parts of the requested MDS assessments, not just PII, under the claim that the redacted information falls within FOIA Exemption 6 because its disclosure allegedly would constitute a clearly unwarranted invasion of personal privacy.  CMS provided no explanation of how the redacted information could invade nursing home residents' privacy given that Tosh had disclaimed any interest in personally identifiable information.  Moreover, CMS' redactions were inconsistent with its prior disclosure to Tosh and others of unredacted, de-identified MDS data relating to individual nursing facilities, and reneged on the agreement reached in the parties' December 21, 2017 conference call.  Although Tosh requested, by email dated February 16, 2018, that CMS explain the basis for its invocation of Exemption 6, CMS never responded.

49.     It has now been **285 days** since Tosh submitted his Nationwide FOIA Request to CMS.  Despite Tosh's cooperation with CMS, his payment of the $9,016 estimated search fee, and his compliance in all other respects with the requirements of CMS' FOIA regulations, CMS still has not produced the records that Tosh requested.  Moreover, the redactions included in the sample provided to Tosh indicate that any records it does eventually produce will be unlawfully redacted and functionally useless.  Thus, CMS has wrongfully withheld records that it should have produced pursuant to the Tosh Nationwide FOIA Request.

4846-2696-2015v.3 0110383-000001

## Facts as to Plaintiff Marks

50.      On September 14, 2017, Marks submitted a FOIA request to CMS that sought

disclosure of "de-identified copies of the MDS data that is routinely submitted by nursing homes

for each resident and kept by CMS in the normal course of its business", requesting all such

records that were submitted from October 1, 2010 through the date of the request.  *See* Exhibit C

(the "Marks Nationwide FOIA Request").

51.      The Marks Nationwide FOIA Request was substantially similar to previous FOIA

requests that Marks and others had submitted to CMS, in response to which CMS had disclosed

the same types of MDS data sought in the Marks Nationwide Request.

52.      Mr. Tripline responded to the Marks Nationwide FOIA Request on September 22,

2017.  Mr. Tripline stated that, pursuant to 45 CFR § 5.22, CMS did not make records available

under FOIA to the extent that the requested records are available "from another part of the

Federal government, under a statute that provides for charging fees for those records."[17]  He

further stated that "an agency is not required to make certain records available for public

inspection and copying, specifically records which have been published and offered for sale."

Notwithstanding CMS' prior disclosure of MDS assessments in response to FOIA requests, Mr.

Tripline directed Marks to the Research Data Assistance Center ("ResDAC") as the only

available source for production of the requested MDS data.

53.      Marks investigated the procedure for obtaining the sought-after records from

ResDAC.  His research indicated that ResDAC did not have MDS data for the timeframe Marks

was specifically requesting.  Additionally, ResDAC's website indicated that not only was there a

question as to whether the data requested could be used for litigation, but also there would be a

---

[17] 45 C.F.R. § 5.22 does not include this specific language, although it appears that previous versions of the
regulation may have.  *See, e.g.*, 53 FR 4375; 53 FR 47697.

18

very significant cost even to examine this data, in excess of $25,000.  *See* Virtual Data Center

Fee List, *available at*

https://www.resdac.org/sites/resdac.umn.edu/files/CMS%20Fee%20List%20for%20Research%2

0Files.pdf .

54.      From Marks' perspective, despite the unreasonableness of the ResDAC fee, if

payment of $25,000 to ResDAC would have resulted in disclosure of the requested data, this

saga would have ended.  Unfortunately, it did not.

55.      Despite his reservations about whether ResDAC had the MDS data for the

timeframe sought by the Marks Nationwide FOIA Request, and whether the data could be

downloaded for analysis, Marks contacted ResDAC on November 1, 2017 via email for

clarification.

56.      Lori Siedelman ("Ms. Siedelman"), a Technical Advisor with ResDAC,

responded to Marks' email on November 3, 2017, informing him that she did not believe that

litigation was an allowable use of ResDAC data and that she had referred individuals seeking

data for litigation purposes to proceed via FOIA.

57.      On November 7, 2017, Marks' counsel in this case sent a letter to Mr. Tripline in

an attempt to resolve the impasse with respect to disclosure of the requested MDS assessments.

The letter explained that CMS's reliance on 5 U.S.C. § 552(a)(2), and the purported availability

of the records via ResDAC, was misplaced and did not excuse CMS from making the requested

records promptly available to Marks pursuant to § 552(a)(3)(A).

58.      Ms. Siedelman followed up with Marks via email on November 8, 2017.   She

explained that CMS had incorrectly directed Marks to ResDAC and that ResDAC only provides

CMS data for standard research, not for use in litigation:

David,

I received some information from our COR this morning. You were incorrectly routed to ResDAC.  Since the data request is not for standard research then we are not the appropriate avenue.  I was instructed to have you submit your request to datauseagreement@cms.hhs.gov.  Include the documentation that you provided me and a completed DUA form.  In the subject line be sure to include "Court Order" or "Litigation", this will ensure that it is routed to the correct person.

Regards,

Lori Siedelman, MPH

Technical Advisor

Research Data Assistance Center (ResDAC)

59.     Despite ResDAC's statement that it was not the appropriate source from which to obtain the requested data, Ms. Dutton responded to Marks' counsel's November 7, 2017 letter via email on November 30, 2017, again asserting that the data sought by the Marks Nationwide FOIA Request was available only from ResDAC.

60.     Marks' counsel responded to Ms. Dutton via email, referring her and Mr. Tripline to ResDAC's statement, noting that CMS' circular rerouting of Marks from CMS to ResDAC to CMS and back had denied Marks timely access to the requested records under FOIA and that CMS had violated its obligations, and Marks' rights, thereunder.

61.      Marks' counsel attempted to reach Mr. Tripline by phone several times on November 30, 2017, but Mr. Tripline failed to answer or return the call.

62.     Mr. Tripline finally contacted counsel on December 4, 2017.  Mr. Tripline once again asserted that ResDAC was the appropriate, and only, source for the records sought under the Marks Nationwide FOIA Request.  When counsel confronted Mr. Tripline with Ms. Siedelman's statement to the contrary, Mr. Tripline instead stated that Marks could get records

from between 2010 and 2015 at ResDAC.  Mr. Tripline informed counsel that he should call Ms. Dutton in an attempt to clarify the issues.

63.     Marks' counsel and Ms. Dutton spoke by phone on December 5, 2017.  Ms. Dutton stated that she would attempt to arrange a call between her program office, counsel and Marks in an attempt to resolve the issue.

64.     Ms. Dutton failed to schedule the call as promised.  On December 13, 2017, Marks' counsel contacted Ms. Dutton by email in an attempt to arrange the call.  Counsel reiterated that time was of the essence, as the data sought by the Marks Nationwide FOIA Request would be used to vindicate legal rights and that any delay would put these rights at risk due to relevant statutes of limitation.

65.     Hugh Gilmore finally agreed to speak with Marks on December 21, 2017.  This was **98 days** after the filing of Marks' FOIA request.  As related in paragraph 46, *supra*, during that call, Mr. Gilmore, on behalf of CMS, agreed to combine the Tosh Nationwide FOIA Request and the Marks Nationwide FOIA Request and produce to both Tosh and Marks all MDS data from January 1, 2012 through the most current date available.

66.     Marks sent an email to Mr. Gilmore on December 21, 2017, confirming CMS' agreement to produce the requested data, confirming that Marks was willing to pay reasonable charges for redaction or transmittal expenses, requesting sample data, discussing the method of transmittal of the data, and laying out Marks' position with respect to disclosure of the Resident Internal IDs for each resident found in the MDS assessments.

67.     However, CMS failed to live up to its commitment.  Marks' counsel emailed Mr. Gilmore on January 9, 2018, to request a status report on the production and other outstanding issues.  However, counsel received an "out-of-office" message indicating that Gilmore would not

return until January 18, 2018.  Counsel then forwarded his correspondence to Mr. Tripline and

Ms. Dutton in an attempt to expedite the process and avoid litigation.

68.     Not having heard from anyone at CMS in the five and a half weeks since the

December 21 conference call between Gilmore and Marks, Marks' counsel contacted Gilmore

again on January 29, 2018, in an attempt to resolve the outstanding issues and avoid litigation.

At this time, it was now **137 days** since Marks submitted the Marks Nationwide FOIA Request.

Counsel asked CMS to respond to his January 9, 2018 correspondence by February 2, 2018.

Counsel further explicitly stated that failure to provide the information by February 2, 2018

would result in litigation against CMS to compel disclosure.  CMS has not responded to

counsel's January 9 or 29, 2018 correspondence.

69.     It has been **216 days** since Marks submitted the Marks Nationwide FOIA

Request.  Despite the fact that Marks' request complied in all material respects with the

requirements of CMS' FOIA regulations, CMS still has not produced the records that Marks

requested, and the redactions included in the sample provided by CMS to Tosh indicate that any

records that it does intend to produce to Marks will be unlawfully redacted and functionally

useless.   Thus, CMS has unlawfully withheld records that it should have produced pursuant to

the Marks Nationwide FOIA Request.

**Administrative Appeal**

70.     On February 28, 2018, Plaintiffs filed an administrative appeal on account of

CMS having failed to act on, and having constructively denied, the Marks and Tosh Nationwide

FOIA Requests.  CMS Control Number 091820177003.

22

71.     In violation of its statutory obligation to rule on that appeal within twenty (20) business days, or if properly extended, thirty (30) business days, *see* 5 U.S.C. §552(a)(6)(A)(ii) and (B)(i), as of the date of the filing of this action CMS has failed to rule on Plaintiffs' appeal.

72.     Plaintiffs have exhausted their administrative remedies.

### Plaintiffs' FOIA Public Interest in Obtaining the Requested Records

73.     Disclosure of the requested records will serve the interests of nursing home residents across the United States by allowing Plaintiffs and other members of the public to objectively determine whether members of this vulnerable population are receiving proper care or, due to staffing inadequacies, are being exposed to conditions that endanger and degrade them.

74.     Disclosure will also serve the public interest by allowing the public to understand whether CMS is adequately ensuring that nursing homes are in compliance with Medicare and Medicaid requirements, whether CMS is adequately pursuing enforcement actions against those nursing homes that are in violation of the federal requirements, whether it is adequately enforcing its own regulations (e.g., 42 C.F.R. § 483.35) and applicable statutes (e.g., 42 U.S.C. §§ 1395i-3 and 1396r), and whether it needs to take additional actions to fulfill its statutory duties.

75.     Thus, even if the requested records were deemed to fall within Exemption 6, any asserted concern about a remotely possible invasion of privacy is substantially outweighed by the public's interest in obtaining disclosure of the requested records.  Withholding of the requested records therefore is not warranted by FOIA Exemption 6 and constitutes an abuse of agency discretion.

### COUNT I – FOIA VIOLATION (FAILURE TO DISCLOSE)

23

76.     Plaintiffs reallege all allegations contained in paragraphs 1 through 75 as if repeated herein.

77.     The Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(3)(A), requires that "... each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place and fees (if any), and procedures to be followed, shall make the records promptly available to any person."

78.     Tosh's and Marks' FOIA requests reasonably describe the requested records, and were made in accordance with published agency rules.  Moreover, Tosh and Marks paid all requested fees.  Further, the requested MDS assessments are easily reproducible in the format requested by Tosh and Marks.

79.     Defendants refusal, or failure, to disclose the requested records to Plaintiffs Tosh and Marks violated FOIA, 5 U.S.C. § 552(a)(3)(A), and applicable agency regulations promulgated thereunder.

80.     Injunctive relief is authorized under 5 U.S.C. § 552(a)(4)(B) to enjoin Defendants from unlawfully withholding agency records, and to order the disclosure of all records improperly withheld.

## COUNT II – FOIA VIOLATION
## (FAILURE TO TIMELY RESPOND)

81.     Plaintiffs reallege paragraphs 1 through 80 as if repeated herein.

82.     FOIA requires that an agency respond to a valid request within twenty (20) business days or, in "unusual circumstances", within thirty (30) business days. 5 U.S.C. §552(a)(6)(A)-(B).  *See also* 42 CFR §§401.136(b), 401.140(b)(1) (CMS rules implementing FOIA time limits).

24

83.     Defendants violated Section 552(a)(6)(A)-(B) and their own rules because they failed, within the time period required by the Act and the rules, to (a) disclose the requested records or (b) provide written responses to Plaintiffs' FOIA requests indicating with adequate specificity whether all, or particular parts, of the requested records would be disclosed, the ground(s) for withholding any parts of the requested records, and the time within which records would be disclosed.

84.     Injunctive relief is authorized under 5 U.S.C. § 552(a)(4)(B) to enjoin Defendants from unlawfully withholding agency records, and to order the disclosure of all records improperly withheld.

## COUNT III – FOIA VIOLATION
## (FAILURE TO DISCLOSE IN REQUESTED FORMAT)

85.     Plaintiffs reallege paragraphs 1 through 84 as if repeated herein.

86.     The Freedom of Information Act, 5 U.S.C. § 552(a)(3)(B), requires that a federal agency "shall provide the record in any form or format requested by the person if the record is easily reproducible by the agency in that form or format."

87.     The MDS assessments are easily reproducible in the format requested by Marks and Tosh.

88.     In refusing to disclose the requested records in the format requested by Plaintiffs, Defendants violated FOIA, 5 U.S.C. § 552(a)(3)(B).

89.     Injunctive relief is authorized under 5 U.S.C. § 552(a)(4)(B) to enjoin Defendants from unlawfully withholding agency records, and to order the disclosure of all records improperly withheld.

## COUNT IV – FOIA VIOLATION
## (IMPOSITION OF UNLAWFUL SEARCH FEES)

4846-2696-2015v.3 0110383-000001

90.     Plaintiffs reallege paragraphs 1 through 89 as if repeated herein.

91.     FOIA provides that "an agency shall not assess any search fees . . . under this subparagraph if the agency has failed to comply with any time limit under paragraph (6)." 5 U.S.C. § 552(a)(4)(A)(viii)(I).

92.     Because CMS failed to comply with the time limit imposed by 5 U.S.C. §552(a)(6)(A) in responding to the Tosh National FOIA Request, its imposition of search fees on Tosh as a condition to obtaining disclosure of the requested records violated Section 552(a)(4)(viii)(I) of the Act.

93.     Further, because CMS failed to comply with the time limit imposed by 5 U.S.C. §552(a)(6)(A) in responding to the Marks National FOIA Request, Section 552(a)(4)(viii)(I) of the Act forbids it from imposing search fees on Marks as a condition to obtaining disclosure of the requested records.

94.     Defendant CMS should be ordered to refund to Plaintiff Tosh $9,016.00 plus applicable interest.

## COUNT V – FOIA VIOLATION AND VIOLATION OF CMS RULES (IMPOSITION OF UNLAWFUL SEARCH FEES)

95.     Plaintiffs reallege paragraphs 1 through 94 as if repeated herein.

96.     FOIA, 5 U.S.C. § 552(a)(4)(A)(ii), provides that "agency regulations shall provide that – (I) fees shall be limited to reasonable standard charges for document search, duplication and review, when records are requested for commercial use...."

97.     CMS's published regulations, 42 C.F.R. § 401.140 ("Fees and charges"), state as follows: (b) *Fee schedules.* The fee schedule is as follows:

> (1) *Search for records.* Three dollars per hour: *Provided, however,* That no charge will be made for the first half hour.

98.     Defendant CMS imposed on Plaintiff Tosh a search fee of $46 per hour for an estimated 196 hours of search time.  In doing so, CMS violated its published rules and FOIA, charged Tosh patently unreasonable search fees, and overcharged Plaintiff Tosh by $8,428.00.

## REQUESTED RELIEF

1.     Order CMS to immediately process Plaintiffs' FOIA requests;

2.     Order CMS to promptly disclose to Plaintiffs all of the requested de-identified records without any other redaction;

3.     Order that the requested records be disclosed in the format requested by Plaintiffs or in an alternative electronic format acceptable to Plaintiffs;

4.     Order  CMS to not impose search or copying fees on Marks or Tosh in connection with its disclosure of the requested records;

5.     Order CMS to refund to Plaintiff Tosh the sum of $9,016, the amount of fees wrongfully collected from Tosh by CMS, and applicable interest;

6.     Award Plaintiffs their costs and reasonable attorney fees incurred in this action, pursuant to 5 U.S.C. §552(a)(4)(E); and

7.     Grant Plaintiffs such other relief as the Court may deem appropriate.


April 18, 2018                                    Respectfully submitted,




                                                 /s/ Burt Braverman_____
                                                 Burt Braverman
                                                 D.C. Bar No. 178376
                                                 Patrick J. Curran Jr.
                                                 D.C. Bar No. 1026302
                                                 **DAVIS WRIGHT TREMAINE, LLP**

1919 Pennsylvania Ave. NW, Suite 800
Washington DC 20006
Telephone: 202-973-4210
Facsimile:  202-973-4410
burtbraverman@dwt.com
patcurran@dwt.com

*Attorneys for Plaintiffs*

28